I'm Nancy Collins and I represent Mr. Ruben Ramirez Ventura and Sharon Blackford is here representing Ms. Perez-Almonte. We just planned that I would talk first, we'll just watch the clock for about seven minutes, addressing the basics of the detention and search. And then Ms. Blackford will discuss the importance of testing the reliability of the dogs and we'll try to save a little time for rebuttal within that. Great. Okay, thank you very much. Thank you. And addressing first the stop of the car for a traffic infraction, the Oregon, after conducting that stop, the Oregon police lacked reasonable suspicion to continue the detention of the driver and the passenger for reasons unrelated to the traffic investigation and ultimately searched the car. An officer may inquire into matters unrelated to a traffic infraction during a traffic stop as long as those inquiries do not measurably extend the duration of the search. Here the traffic investigation was easily resolved and then the police relied on a combination of weak factors that do not amount to reasonable suspicion to prolong the detention to seize Mr. Ramirez Ventura and Ms. Perez-Almonte, apply a dog and search the internal upholstery of the car. The government relies on knowledge that the DEA had under the collective knowledge doctrine to support this search and the detention. But the collective knowledge doctrine does not apply in this scenario. It is the opposite of a situation where the police issue a bulletin asking other officers to take action. Here the DEA disavowed their own investigation and told the Oregon troopers to develop their own probable cause to stop the car. By disavowing their own investigation, they did not supply the Oregon police grounds to factor into the reason that they're stopping the car, detaining the people in the car and then searching the car. It is not... Ms. Collins, what's... Excuse me, I'm sorry, we have a slight video delay. I didn't mean to step on your lines there. What significance do you attach to the officer's statement that there was an overwhelming odor of air freshener or whatever it was when he approached the car? That's one factor that the court used. In fact, the other factors that are used are essentially benign. Air freshener is something that drug dealers might use but is also susceptible to an innocent interpretation in many cars that are... Well, there was no... I find significant that the officer said that this was an overwhelming... I mean, everybody knows about air freshener. You know, everybody who goes to a car wash knows about air freshener. But they're saying this is unusual, this is overwhelming and no one said, no, it was just ordinary air freshener. Isn't that a suspicious circumstance? At least it justifies further inquiry. I agree that it's a circumstance that they can use that would be a positive factor to calculate into the reasonable suspicion determination. But that alone I don't believe is enough. And the rest of the factors... Well, it may not be enough for probable cause, but why is it enough to investigate? You go to the door and the smell knocks you over. Why isn't that worth leaving aside that they were tipped off by the DEA? Why isn't that in itself justification to at least say what's going on here? Ultimately, it does come down to how you weigh these facts. But our position is that the air freshener is really the only fact that does supply that indication of criminal activity to any degree and that in and of itself is not reasonable suspicion. The travel that the troopers pointed to is essentially benign and very common. There were no counter-surveillance maneuvers that were going on. It was essentially unremarkable driving that many people who live in Seattle and who travel on I-5 would end up being on that time of the day on that highway. The presence of cell phones or, you know, extremely ubiquitous instruments these days would also be a very minor weak factor that could contribute to a reasonable suspicion determination under the totality of the circumstances approach. But it is simply not enough. It is only by looking at this DEA investigation that they were essentially relying on that, even though the DEA had said, you know, for reasons. It could be that the DEA wanted an independent basis because their own investigation had been tainted and they wanted an untainted police investigation. It could be that the DEA didn't really have enough. But when the DEA says develop your own probable cause, the troopers are not therefore permitted to rely on that. The notion that the DEA wouldn't be involved in the case were not something bad happening. They needed to rely on what they saw, observed on their own, and they simply didn't have enough here to amount to reasonable suspicion to extend the stop to question the driver and passenger and then to apply the dog. And because I don't want to- Let me ask you this. I want to make sure I understand how this would work. If we disagree with you, if we say you look at the totality of everything, the demeanor of the people in the car, the smell of the air freshener, whatever, you know, the whole calculus, if we say that was enough to create a reasonable suspicion warranting investigation, not probable cause for arrest but warranting investigation, if that's correct, then is there any problem bringing the dog in to sniff? The standard is whether they measurably extend the duration. If there was reasonable suspicion to detain Mr. Ramirez's material, put him in the car, and bring out the dog, then the question is really whether that dog alert is reliable. And I can let Mr. Black- I think you misunderstood my question. My question is if they had enough to be suspicious, was there any problem bringing in the dog to sniff? No, I don't think there was a problem bringing in the dog to sniff necessarily. If they had the basis to detain them, the dog was there. They didn't. But it did prolong the stop to a degree, but then the question would be whether- Yeah, and if they didn't have the right to do it, then they didn't have the right to do it. But if they had the right to make an investigation, then they had the right to bring in the dog. Yeah, I believe so, yes. And how long- Okay, now, if then the dog alerts on the car, isn't that probable cause to search the car? Yeah, that would be so long as the reliability of the dog was properly proven and we were permitted to properly contest that. Yes, that would be the standard. And to answer Judge Riguero's question about the timing, it appears that they were- the car was stopped at about 4.40 in the morning. At about 4.55 or 4.58, they were all in handcuffs because the dog had, at that point, alerted. But then the search of the car didn't happen for about another 20 minutes. They waited until the sergeant arrived before they began searching the car. That was at 5.15. And it took about 10 minutes, according to Trooper Costanzo, to actually find drugs in the upholstery of the car. So ultimately, it looks like it's about 45 minutes of being at the side of the road before they find drugs in the car. But from the time that they stopped them to the time of the prolonged- because you're challenging, really, from the time they were stopped, I guess, to when the dog arrived, I think, is the time period that you say was excessive and that there was no basis. Yes, that there was no basis to hold them there and then continue to hold them while they applied the drug. So how long was that? I mean, they were stopped at what time? At 4.40. And then smelled the car, the air freshener. And then the dog arrived at what time and alerted at what time? The testimony was that at 4.40 the dog arrived, and by 4.55, Mr. Ramirez-Ventura, the dog had done its alert. And then both of them were handcuffed and placed in the car and Mirandized, and then the car searched. And if I could just cede the rest of my time right now to Ms. Blackford to talk about the other issue. Thank you. Thank you very much. Good morning, Your Honors. I'm Sharon Blackford, and I represent Marisol Perez-Armonte. As this Court is undoubtedly aware, the U.S. Supreme Court has accepted review of Florida v. Harris, the Florida Supreme Court case upon which I relied quite heavily in my briefing on the issue of what kind of showing the government needs to make on canine reliability. So since we're going to be receiving guidance on that issue in the foreseeable future that would be far more valuable than any comments I might make on it, I suggest that I would focus my comments on the issue of the denial of the expert in this case. If that's accessible to the Court, I will proceed. Thank you. Ms. Perez-Armonte requested $2,500 for an experienced canine drug detection expert. It's an abuse of discretion to deny a statutory request for such an expert for an indigent criminal defendant where reasonably competent counsel would have required the assistance of the requested expert for a paying client, and the defendant was prejudiced by the lack of the expert. On the first prong, there was substantial evidence to support the reasonableness of competent counsel requiring a canine drug detection expert in this case. Ms. Perez-Armonte went to great lengths to explain, justify, and preserve her request for a canine drug expert. Her attorney made an initial written request, repeated the written request after denial, renewed the request again orally during the suppression hearing, and then renewed it a third time in writing in the post-closing argument, the written argument. That fourth request includes a specific offer of proof detailing several kinds of issues the expert would address and what kinds of problems with the canine team's performance in this specific case the expert could resolve or assist the Court to understand. Some of the specific problems in this case that the expert could have assisted the Court to understand are the handler admitted he cued the dog to focus especially on the area where the dog alerted. No one was able to connect this behavior with the issue of canine reliability for the Court. That simply never happened. The handler admitted the dog typically alerted to residue and the co-defendant had previously told the police that he had made several trips with drugs previously in this vehicle. The handler asserted a 100% canine accuracy rate based purely on his guess, based on no records, in the absence, in fact, of any record keeping regarding the dog's actual field performance and contrary to the evidence. Ms. Blackburn, let me ask you a question. Yes. One of the concerns I have is all of these facts were presented to Judge Lasnik. Were they not? Yes, Your Honor. However, I would argue that there is a difference between presenting a fact and understanding the significance of that fact and that, unfortunately, the second... Well, I mean, he's not an idiot. If you have someone get up there and say the handler deliberately told the dog to go alert on the car, I mean, Judge Lasnik doesn't need an expert to interpret that. If he speaks English, he understands what that means. If you say that the dog has 100% reliability because he always alerts whether there's nothing there or not and the explanation for that offered by the officer is baloney, Judge Lasnik can understand that. He doesn't need an expert to tell him that, does he? Your Honor, I would be the last person to claim that Judge Lasnik is not a man of great understanding and learning. However, in this case, connections needed to be made between these facts and the issue of reliability that were not made, and with all due respect to Judge Lasnik, I don't believe he understood their connection to the issue of reliability and have several examples to show that. How could that be? What could he not deduce from what you just told us? Well, the fact that he related Why do you need an expert to help him wrap his mind around this? Well, Your Honor, we can only go by what Judge Lasnik said and what he wrote and then reason backwards as to the answer to your question. For instance, the fact that in his written denial, he cited the dog as having a 100% accuracy rate, despite the fact that the dog missed an aid and certification and that the trooper himself said that, oh, the dog maybe misses 5% of Okay, but that's a different thing. Maybe he got the facts wrong. Maybe he misunderstood the evidence. Maybe there weren't, maybe his factual findings were not supported by sufficient evidence. But to say that he's an expert to help him comprehend it is a different argument. Well, Your Honor, I'm partly also basing that on the fact that the judge himself said that he had no idea where she was going with this issue. He said he was frustrated with it, he didn't expect it, he didn't understand it, and he didn't know where it was going. He didn't understand why it's relevant, I think is what he was saying. Exactly, and that's exactly the kind of thing that an expert would do. And that's because he said as long as the dog is properly trained and certified, as far as he's concerned, maybe he's right legally, maybe he's wrong legally, but as far as he's concerned, all the law requires is that the dog be properly trained and certified to get it into evidence. That's not the statement of law that the Court used in its written opinion, Your Honor. The Court used the correct statement of the law in the circuit, which is that it has to be properly certified and reliable, as I know Your Honor held right in Sedano-Arellano. So the reliability is what is at issue here. What I am saying is that Judge Lasnik conflated certification with reliability and didn't require reliability, only required certification. However, that there was a misunderstanding on his part because he thought that certification was a stand-in for reliability. Therefore, he did not understand how any other fact could pertain to reliability. He didn't make that connection, and I believe his lack of understanding was genuine. I believe his frustration that he stated was genuine, and he simply didn't understand reliability could stem from something other than certification, but he did say the right standard. So he knew what the law was. My question really was going to you. We see errors by judges all the time. In fact, we on the Ninth Circuit make them from time to time. But it's not for lack of having an expert opinion. It's for other reasons. Well, Your Honor, there are also unfortunately statistical issues present in this case as far as the calculation of a probability rate, which is not a simple matter of subtracting and adding and plus and minus. That's why Ms. Perez-Almonte's attorney was reduced to trying to explain something awful like the Bayes theorem to the court to try to get the court to understand that the combination of the trooper's admitted 5% error guess combined with all the false positives and other things that he didn't do when training this dog and noting down results in the field log could very well, very, very easily give rise to a very large percentage rate. But you would never know that unless you understood the Bayes theorem, how to use it, how to calculate it, and how to connect it to reliability. That's not something that Mr. Kenev was able to do. When he tried to do it, it received a very flat reception from the court. The court didn't understand it. And Ms. Perez-Almonte desperately needed an expert to explain why this awful theorem was something that should even be considered by the court. It's a scientific, technical matter. This is not a matter of lay evidence. This is technical evidence. And I believe that, with all due respect, the judge went wrong when he treated this as a simple, common-sense matter. I love common sense, but this is not a common-sense matter. It's a scientific, technical one. And because of all the issues that were presented, there just was not a basis to make simple, common-sense plus and minus conclusions in this case about the dog's accuracy rate. Are there two approaches to this? I mean, we have the Harris-Florida case, the Florida v. Harris case. And then is there a Sixth Circuit United States v. Diaz? Do they offer two different ways to address dog reliability, drug dog reliability? Well, I'm not pulling the Diaz facts out of my head, but I'm wondering if perhaps Your Honor is talking about the distinction between requiring an expert only when there are unusual circumstances in a case that would warrant it versus requiring an expert or a particular showing of reliability in all cases generally. I know that the Sixth Circuit in particular has been struggling with that in Howard and in Steppe, and I believe that came up in Diaz. Is that what Your Honor is referring to? Well, I guess in Diaz, the approach is used is to, I guess the test announced in Diaz is that the dog handler's testimony about dog's training and field performance was sufficient to establish the dog's reliability. And if a dog is generally certified, any evidence that would undermine the dog's reliability goes to its credibility. Certainly, Your Honor. And here, the evidence of reliability provided by the handler was flawed. So in essence, the government's position would be that the evidence, the testimony of the handler should be treated as unrebuttable, whereas in fact, as here, the testimony of the handler did reveal that there were several problems with the reliability of his dog. Therefore, the handler's testimony opened the door to the need for further evidence. And I would argue that after the suppression hearing, as a result of the testimony of the handler at the hearing, there was a greater need for an expert than perhaps there even was before the hearing because of the specific problems that came out at the hearing. That's what opened the door and threw the handler's own testimony into grave doubt. It threw, not because I'm accusing him of being dishonest. I'm not. But one of the things that Judge Lasnik didn't understand was that an honest trooper making his best efforts can make an honest mistake that renders the result unreliable. So that is the sort of problem that we came across in the suppression hearing here. The trooper candidly and easily and freely admitted some of the mistakes that he made. But I guess that goes back to Judge Silverman's question, is that typically what happens in a jury or before a judge is that that's the whole value of cross-examination, that you can point to the unreliability and make that argument with that cross-examination. Obviously, it went well because the handler admitted, basically, that he didn't keep the information. I mean, clearly his credibility and the dog's credibility then is in play. The credibility was in play, but I would say two things, that no, it didn't go well because Judge Lasnik wasn't able to make the connection between the handler's testimony and reliability, and two, that it only went well in terms of raising issues that put the reliability of the dog in error or in question and caused the need for a further investigation. And I would like to reserve the rest of the time unless Your Honor has a pressing question. Well, what would have been proof to you that Judge Lasnik would have understood the connection to credibility and reliability? For instance, if he hadn't cited in his written report that there was a 100% accuracy rate, if he had not kept on referring to mistakes by the dog handler team as mistakes attributable only to the handler. He did this chronically throughout the hearing. He kept saying, oh, well, that was the team, but that was the handler. The handler didn't put the dog in the right place. The dog itself, he kept insulating from any idea of imperfection, and he didn't recognize that the canine handler team reliability is what's at issue here. So any problems that came up, he carved out, attributed to the handler, and then ruled basically only on the reliability of the dog as if that were perfect and unimpeached, but it was not. Thank you. Thank you. Thank you, Your Honor. May it please the Court, my name is Kate Chrisham, and I'm here today on behalf of the United States. The key question this appeals to is whether the Oregon State Troopers had sufficient probable cause to search the defendant, Chevy Tahoe, without a warrant. And the answer to that question is yes. The district court correctly held that the totality of the circumstances, which included the DEA's extensive knowledge, which was imputed to the troopers through the collective knowledge doctrine, the defendant's behavior during the stop, the facts and circumstances of their travel, and finally the positive alert of the canine dog, all indicated more than a fair probability that the defendants were transporting drugs in their Tahoe. As a result, the troopers had probable cause to conduct that warrantless search, and the district court correctly denied their motions to suppress. Defendant Perez-Almonte spends the majority of her brief and her argument challenging whether or not that positive canine alert was enough to vest the troopers with sufficient probable cause. And the Ninth Circuit case law and the record in this case about the dog's training, the dog's certification, and the dog's accuracy was sufficient on its own to establish that probable cause. However, the court does not even need to reach that issue, and that's because under the collective knowledge doctrine, as set forth in this court's decision in Ramirez, all the facts that DEA Special Agent Jack Wilson knew about the defendants and about their trip to California was imputed to the troopers. And Special Agent Wilson had a wealth of knowledge about these two defendants and about their trip, and that was enough to establish probable cause to believe that they were using this Tahoe to transport drugs. If I could just go through those facts briefly. First, Special Agent Wilson was familiar with both defendants from a previous investigation he had done into Ms. Perez-Almonte's ex-husband, Rotario Santos Rojas. In the course of that investigation, both the defendants were implicated in drug trafficking. Ms. Perez-Almonte was charged with money laundering and proceeds of drug trafficking. She eventually pled guilty to structuring a financial transaction. Mr. Ramirez-Ventura was – Mr. Santos Rojas, eventually once he began cooperating, told law enforcement that Mr. Ramirez-Ventura was also a drug trafficker. The DEA put a tracker on Mr. Ramirez-Ventura's car, and he followed him on a trip very similar to this one down to California, where he had a very brief stay and then came back up to the Washington area. Again, he was not charged, but Special Agent Wilson was aware of that fact. With regards to the incident investigation, Special Agent Wilson was aware that a CI had told the DEA that the target, Mr. Asmar Sanchez, worked for a boss who used a gold Chevy Tahoe to transport money and drugs back and forth between Mexico and Washington. And the agents were aware through surveillance that Mr. Ramirez-Ventura did drive a gold Chevy Tahoe. They were also aware that before and after a controlled buy, in which Mr. Asmar Sanchez sold 120 ounces of methamphetamine to an undercover officer, Mr. Asmar Sanchez had numerous contacts with Mr. Ramirez-Ventura, both in telephone and in person. In fact, immediately after that deal, the first person that Mr. Asmar Sanchez met with was Mr. Ramirez-Ventura. And finally, Special Agent Wilson was aware of all the circumstances of the trip to California. He was aware that both defendants left in the middle of the night from their home to Renton and immediately started driving down to Moreno Valley, California. The circumstances of their trip appeared to be very unusual. They did not see anyone other than a man they met in the parking lot. They drove down, spent the night, had lunch at a restaurant. Then they had this meeting with the man in the parking lot. They met outside for a few minutes. All three of them went into a hotel room. About 10 minutes later, a third man comes back out to his car carrying a small package. About 10 minutes later, the defendants walk out. They spend about 20 minutes in the car. Ms. Preselmonte appearing to act as a lookout. Mr. Ramirez-Ventura appears to be tampering with something in the back, which could be a secret compartment, and indeed likely was a secret compartment. And then shortly thereafter, they began their trip back up to Washington. And those facts on their own are enough to establish probable cause. And respectfully, Mr. Ramirez-Ventura, it's simply incorrect that the Collective Knowledge Doctrine does not apply in situations like this. And the Ramirez case is almost on all fours with this case. In that case, the narcotics department of the Glendale Police Department was investigating a drug trafficking ring. They observed a Mercury Mountaineer that they had previously believed to be involved in drug trafficking. They saw what appeared to be a drug transaction. The Mountaineer then began driving. And just like Special Agent Wilson here, the narcotics detective there did not want to expose his investigation in case he was wrong. So he sent out an alert asking for a patrol officer to do a traffic stop, just as Special Agent Wilson did here. He did not give any information about why the traffic stop should be conducted. Instead, he let the patrol officer make his own cause through the traffic stop, again, just as Special Agent Wilson did here. Sure enough, in Ramirez, the defendant there at one point had a lane violation. He was pulled over. Drugs were discovered by the patrol officer, who had no understanding of what the narcotics officer knew. And the Ramirez court found that the narcotics officer's knowledge should be imputed to the patrol officer in doing that search. And respectfully, that's exactly our case here. And given that, this court does not even need to reach the issue of what the troopers themselves knew. However, even without Special Agent Wilson's knowledge, all the facts and circumstances surrounding the case was more than sufficient to establish probable cause. The canine alert on its own, based, again, on the extensive evidence before the court about the canine's reliability, and this court's prior rulings that a certified drug dog, a positive alert by a certified drug dog on its own, is sufficient to establish probable cause. It's important to note that troopers did not just rely on that positive canine alert. There were a number of other facts and circumstances that, when taken together, established probable cause. And really, the canine alert was icing on the cake. There was the overwhelming smell of air freshener, which, as acknowledged, was not consistent with what ordinary drivers use. On a scale of 1 to 10, it was a 10, and it absolutely overwhelmed the troopers, both of them, when they walked up. There was the time and the route of travel, which, on its own, could be benign, but taken in connection with all the other circumstances, provided yet another link in the probable cause chain. Finally, the multiple cell phones, which Trooper Costanzo said that he looked familiar to him, ones that he had seen other drug traffickers use. So there was the fact that the DEA was investigating this car, that they had a tracker on it, that it was likely more than a mere hunch that narcotics were involved. And finally, there were the defendant's behavior. Mr. Ramirez-Ventura could not give the name of the host that he supposedly stayed with for three days in California. He broke eye contact when asked whether or not there was cocaine in his car. And even more disturbingly was the behavior of Ms. Perez-Almonte. When Mr. Ramirez-Ventura was being questioned, she stuck her head out the window and began screaming at him frantically in Spanish. Both troopers said that that concerned them for many reasons. First of all, it seemed very suspicious. But more importantly, they didn't know what was going to happen. They didn't know if there were guns in the car. They didn't know what she was shouting at him. But all of that on its own, frankly, was enough to establish probable cause. And certainly once the dog alerted, that was enough to give the troopers a reason to search the car. Unless the Court has any questions, we will rest on our briefs. Thank you. Thank you. I'll give you two minutes. Beg your pardon? You can have two minutes. I'll try and make it short. I'll plow through. Okay. Your Honors, I would like to further address a little bit the point that you in particular raised, Judge Silverman, about what are indications that we have that Judge Lasnik would have been aided by an expert or perhaps would have been able to view things in a more complete light if he had an expert. The Court itself termed the issue of the handler missing an aide in the certification and any further behaviors in certifications as silly. And he cut short that line of questioning and said, regarding recertifications or any other questions about behavior of the dog or handler during certifications, the point is he got certified each year. That's all I care about. I don't care whether he made a mistake. To me, this shows that an expert would have helped him to understand the significance of a mistake since it was the judge's job to evaluate the reliability, and that's central to the reliability. Also, another indication that an expert would have been of benefit is that the judge said during one of the arguments, where's the mistake? The drugs were there. You think this was all a sham, that this dog had no idea what he was doing, or this is a trooper that has no idea what he's doing, and the whole thing was a pretext, like, you know, putting a divining rod on the ground and saying there's water there and it's just a game or something? The problem with this characterization by the judge is that it's an all or nothing sham or 100% accurate sort of view. And it demonstrates that an expert would have been helpful to explain how an honest trooper could make an honest mistake, and that that's not a matter of a pretext or dishonesty or divining rod, but that there are degrees and distinctions in this matter. That's something that the judge in this case, I believe, did not have sufficient attention drawn to and that an expert would have helped him to draw his attention there. If there are any further questions, I'd be delighted to answer them. Otherwise. Thank you. Thank you very, very much. Thank you all for your presentation, your arguments today. The case is submitted. The court will be in recess. Thank you very much.
judges: Kobayashi, Silverman, Murguia